**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| MICHAEL SARBACKER, | |
| **Plaintiff,** | **8:14CV341** |
| vs. | |
| TD AMERITRADE HOLDING CORPORATION, TD AMERITRADE, INC., TD AMERITRADE CLEARING, INC., FREDERIC J. TOMCZYK, and PAUL JIGANTI, | **FINDINGS AND RECOMMENDATION** |
| **Defendants.** | |

This matter is before the court on the defendants' Motion to Dismiss Putative Class Action Complaint and Request to Take Judicial Notice (Filing No. 54). The defendants filed a brief (Filing No. 55) and an index of evidence (Filing No. 56) supporting the motion. The plaintiff filed a brief (Filing No. 59), with exhibits attached, and an index of evidence (Filing No. 60) opposing the motion. The defendants filed a brief (Filing No. 63) in reply.

**BACKGROUND**

The plaintiff challenges the defendants' practice of routing "virtually all" customers' orders to the trading venue offering the defendants the "largest kickbacks" in the form of payment for order flow or liquidity rebates, rather than based on the venue offering the best execution for the trades. **See** Filing No. 1 - Complaint p. 2-3.[1] The defendants provide securities broker-dealer services. **Id.** ¶¶ 11-15. The plaintiff has been the defendants' customer since 2008 and has repeatedly traded various securities using the defendants' services. **Id.** ¶ 10. The plaintiff purports to represent all of the defendants' retail clients in equity securities and options who traded from August 12, 2009, until October 31, 2014. **Id.** ¶ 16. The plaintiff alleges the defendants' routing practice constitutes a breach of a uniform client agreement. **Id.** at 32. The client agreement provides:

---

[1] All page number references correspond to the numbers assigned when filed in the CM/ECF system.

> [the defendants] consider a wide variety of factors in determining where to direct [client] orders, such as execution price, opportunities for price improvement . . ., market depth, order size and trading characteristics of the security, efficient and reliable order handling systems and market center service levels, speed, efficiency, accuracy of executions, and the cost of executing orders at a market.

*Id.* ¶ 86 and attached Ex. A Client Agreement § 8(a).

In addition to the breach of contract claim, the plaintiff alleges fraud by intentional misrepresentation or omission (Count II), negligent misrepresentation (Count III), violations of Nebraska's Consumer Protection Act (NCPA) Neb. Rev. St. §§ 59-1601 to 59-1623 (Count IV), and aiding and abetting (Count V).  **See** Filing No. 1 - Complaint p. 32-36.  The plaintiff alleges he suffered damage, including economic injury, as a result of the defendants' failure to execute trades in a manner complying with the contract and duty of best execution.  *Id.* at 31-35.  Additionally, the plaintiff alleges his trades were sent to venues where they were exploited by others, causing him to miss profit opportunities.  *Id.* at 33-34.  In these ways, the plaintiff contends the defendants were wrongly enriched.  *Id.* at 31.  Although the plaintiff suggests his economic injury could be determined at trial, he seeks "restitution of commissions on all trades, and/or disgorgement of profits from payments for order flow and liquidity or maker rebates earned from [the defendants'] material and opportunistic breaches of contract and misrepresentations" and "attaching, impounding and imposing a constructive trust on or otherwise restricting the proceeds of Defendants' trading activities or their other assets."  *Id.* at 36-37.

The defendants filed a motion to dismiss the plaintiff's Complaint on three grounds.  **See** Filing No. 54.  Initially, the defendants assert the plaintiff's claims are preempted by the Securities Litigation Uniform Standards Act of 1998 (SLUSA), 15 U.S.C. §§ 77p, 78bb(f).  *Id.*  Alternatively, the defendants argue the plaintiff's claims are preempted by federal regulation.  *Id.*  Finally, the defendants contend the plaintiff's Complaint fails to state a claim for relief on the merits.  *Id.*

For consideration of their motion, the defendants seek judicial notice of certain sections of the Federal Register and Code of Federal Regulations.  **See** Filing No. 54 - Motion p. 2.  Additionally, the defendants seek judicial notice of excerpts from a June

17, 2014, transcript for a hearing before a U.S. Senate subcommittee.  *Id.*  The plaintiff does not object to taking judicial notice of these documents, which are embraced by the Complaint, but does object to the defendants' reference to a single page of a document, which the plaintiff provides in full.  **See** Filing No. 59 - Response p. 19 n.6.  In any event, as part of the court's review of the defendants' motion, the court may consider exhibits annexed to the Complaint or incorporated by reference.  **See** Fed. R. Civ. P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."); ***Zayed v. Associated Bank, N.A.***, 779 F.3d 727, 732 (8th Cir. 2015); **see *SEC v. Siebel Sys., Inc.***, 384 F. Supp. 2d 694, 699 n.6 (S.D.N.Y. 2005) (taking judicial notice of transcripts relied upon by complaint).  The court takes judicial notice of the exhibits identified not for the truth of the facts asserted therein, but solely to determine the content of the testimony and regulations.

The plaintiff's Complaint relies on sources other than the plaintiff's personal knowledge for many of his allegations.  The Complaint quotes or references a 2012 book, Dark Pools, written by Scott Patterson and a 2014 book, Flash Boys, written by Michael Lewis (Lewis).  **See** Filing No. 1 - Complaint ¶¶ 59, 72.  Lewis' book relies upon interviews with Chris Nagy (Nagy) who worked for the defendants until 2012.  *Id.* Additionally, the Complaint references testimony given by Steven Quirk (Quirk), a senior executive for the defendants, before the U.S. Senate's Permanent Subcommittee on Homeland Security and Governmental Affairs, on June 17, 2014.  *Id.* ¶¶ 54-56, 66-68; **see** Filing No. 56-2 Ex. 1(A).  The Complaint also relies upon academic research regarding order routing practices of various brokers.  **See** Filing No. 1 - Complaint ¶¶ 76-78.  The defendants oppose reliance on most of this information, arguing the court should not credit what is taken out of context, generic, and irrelevant to the plaintiff's claims.  **See** Filing No. 55 - Brief p. 58-61.

## ANALYSIS

### A.  SLUSA Preemption

The court reviews dismissal of a state law claim based on SLUSA preemption as a dismissal for failure to state a claim.  ***Kutten v. Bank of Am., N.A.***, 530 F.3d 669, 670 (8th Cir. 2008).  Congress intended SLUSA, an amendment to the Securities Act of

1933 and the Securities Exchange Act of 1934, to preempt claims by plaintiffs eluding Federal law requirements and protections by filing specified types of actions in State court. *Sofonia v. Principal Life Ins. Co.*, 465 F.3d 873, 876 (8th Cir. 2006) (**citing** H.R. Rep. No. 105-803 (Oct. 9, 1998) (Conf. Rep.)).  Specifically, Congress sought to curb perceived abuses of class action cases involving securities and enforce heightened pleading requirements.  *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81-82 (2006).  Accordingly, SLUSA allows removal and "expressly preempts all state law class actions based upon alleged untrue statements or omissions of a material fact, or use of a manipulative or deceptive device or contrivance, in connection with the purchase or sale of a covered security." *Dudek v. Prudential Sec., Inc.*, 295 F.3d 875, 879 (8th Cir. 2002); **see** 15 U.S.C. §§ 77p(b)-(c), 78bb(f)(1)-(2). The plaintiff concedes he has alleged a fraud.  **See** Filing No. 59 - Response p. 21.  In fact, the court finds a fair reading of the substance of the plaintiff's allegations shows the defendants' alleged misrepresentations and omissions are factual predicates giving rise to liability for all of the plaintiff's claims.  In this matter, the plaintiff disputes only whether the defendants' conduct was in connection with the purchase or sale of a covered security. *Id.* at 20-27.

The plaintiff alleges the defendants' alleged conduct was not "in connection with" the purchase or sale of a covered security because the conduct was not material to his decision to place stock purchase orders for particular covered securities.  *Id.* at 21. Rather, the plaintiff contends the decision to utilize the defendants' brokerage service was separate and independent from the stock purchase decision.  *Id.* at 21-22, 25.  The plaintiff highlights that the defendants' alleged conduct had no impact on which securities the plaintiff purchased or sold because the defendants did not "steer" him toward particular securities with their conduct.  *Id.* 23 & n.7.  The plaintiff contends his claims revolve around the substance of the relationship between a broker and its clients instead of a garden variety securities case brought by a class of investors challenging the fraudulent inflation of publicly traded corporation's share price.  *Id.* at 24.  The plaintiff distinguishes this case from *Dudek*, because here the defendants' conduct did not cause the "plaintiffs to invest in inappropriate securities." *Id.* at 25 (**quoting** *Dudek*, 295 F.3d at 878).

The Complaint alleges the "case arises out of Defendants' failure to provide best execution to TD Ameritrade clients[, p]ursuant to regulations imposed by the SEC and FINRA, and the terms of its own Client Agreement."  **See** Filing No. 1 - Complaint ¶ 1. The plaintiff alleges he paid a fee for the defendants' brokerage services, including best execution.  **Id.**  The Complaint describes the defendants' best execution duty as one comparing venues "based on numerous considerations, such as price improvement for the client's trade, the speed of the trade's execution and the trading characteristics of the security."  **Id.**  The Complaint further describes how the defendants' routing based on maximizing order flow compensation allowed exchanges and other market participants to increase their own profits when the orders became executed trades.  **Id.** ¶ 4.  The Complaint alleges the defendants engaged in fraud by making material misrepresentations and omissions in the client agreement and various other public statements for the purpose of inducing the plaintiff to place orders with the defendants. **Id.** ¶¶ 91-94.

"Under **Dabit**, however, 'it is enough that the fraud alleged "coincide" with a securities transaction—whether by the plaintiff or by someone else.'"  **Siepel v. Bank of Am., N.A.**, 526 F.3d 1122, 1127 (8th Cir. 2008) (**quoting Dabit**, 547 U.S. at 85) (concluding that SLUSA prohibits "state-law claims that a trustee breached its fiduciary duty by failing to disclose conflicts of interest in its selection of nationally-traded investment securities").  The plaintiff contends a more narrow interpretation is required by **Chadbourne & Parke LLP v. Troice**, 134 S. Ct. 1058 (2014).  **See** Filing No. 59 - Response p. 13, 20-26.  In **Troice**, the Court held, "[a] fraudulent misrepresentation or omission is not made 'in connection with' such a 'purchase or sale of a covered security' unless it is material to a decision by one or more individuals (other than the fraudster) to buy or to sell a 'covered security.'"  **Troice**, 134 S. Ct. at 1066 (noting the Court "do[es] not here modify **Dabit**").

Even after **Troice**, courts have interpreted application of SLUSA broadly.  The plaintiff cites no case holding the fraudster's conduct must induce purchase or sale of a **particular** security.  **See Marchak v. JPMorgan Chase & Co.**, No. 11CV5839, 2015 WL 500486, at *17 (E.D.N.Y. Feb. 6, 2015) (applying SLUSA to claims by the plaintiffs who invested in fund whose manager falsely represented he would use the money to

trade in options or other securities).  In fact, the buyer or seller need not actually be the plaintiff.  Rather, the post-*Troice* cases affirm the prior cases determining SLUSA may apply even where a third party or intermediary is involved.   Under a "functional approach," the courts examine "whether the purpose of a plaintiff's investment is to take an interest in a covered security."  *Marchak*, 2015 WL 500486, at *17 (applying SLUSA to fraud in connection with the plaintiffs' attempt to take ownership of securities by acting through a third party investment accounts manager who promised to purchase covered securities on the plaintiffs' behalf).   Nevertheless, the "in connection with" requirement may be narrowly construed with respect to whether the fraud was the type "to induce someone to buy or sell (or hold) a covered security."  *In re Harbinger Capital Partners Funds Investor Litig.*, No. 12CV1244, 2015 WL 1439520, at *6 (S.D.N.Y. Mar. 30, 2015) (applying SLUSA to allegations that the same misrepresentations began while the investments were covered securities and continued when they became privately held); **compare** *In re Tremont Sec. Law, State Law & Ins. Litig.*, No. 08 Civ. 11117, 2014WL1465713, at *3 (S.D.N.Y. Apr. 14, 2014) (declining to apply SLUSA to claims by the plaintiffs who bought limited partnership interests in funds but had no ownership interest in covered securities even though funds purchased covered securities for themselves); *Bachman v. A.G. Edwards*, No. 4:05CV770, 2005 WL 2346896 (E.D. Mo. Sept. 26, 2005) (declining to apply SLUSA after the plaintiffs disavowed any right to relief in connection with covered securities).

The plaintiff's allegations are based on the premise the decision to place the order may not have been materially affected by the defendants' later conduct, but clearly allege the plaintiff's order's attractiveness and execution efficiency were materially affected by the defendants' placement of the order with a venue based solely on payment for order flow.  **See** Filing No. 1 - Complaint ¶¶ 79-83, 93-95.  In any event, the plaintiff also alleges the defendants' conduct was based on an undisclosed policy and practice, in conflict with the defendants' client agreement and other public statements, pre-dating the orders which were routed to market centers providing the highest self-serving profits.  *Id.*  In essence, the plaintiff relied on the defendants' alleged misstatements and omissions of information about the scheme to place the orders.  The plaintiff admits he relied on the defendants' statements which induced him

to place the orders.  *Id.* ¶ 94.  Moreover, the damages sought by the plaintiff are related to the effects of the order execution, in fact calculated per order executed, rather than the order placement, indicating the plaintiff's own belief the fraud is inextricable from the order execution, which includes both the benefits and the purchase or sale of securities. Accordingly, in this case, as in *Segal*, the "allegations do not merely 'coincide' with securities transactions; they depend on them."  *Segal v. Fifth Third Bank, N.A.*, 581 F.3d 305, 310 (6th Cir. 2009) (SLUSA barred state-law securities-related class action claims alleging the defendant carried out a "planned corporate scheme" that was "intended to (and did) lure grantors, testators, and others to [benefit defendant]" and the defendant "did not deal honestly, ethically, fairly, and/or in good faith" with the putative class members.); **see** *Romano v. Kazacos*, 609 F.3d 512, 522 (2d Cir. 2010) (defining "coincide" as broad in scope to include the plaintiff's claims that "necessarily allege," "necessarily involve," or "rest on" the purchase or sale of securities); **compare** *Spielman v. Merril Lynch, Pierce, Fenner & Smith Inc.*, No. 01 CIV 2013, 2001WL1182927, at *4-5 (S.D.N.Y. Oct. 9, 2001) (declining to apply SLUSA where misrepresentations related to fees unconnected to underlying securities, which fees involved relationship between parties, rather than anything integral to purchase of covered securities).

The plaintiff's allegations of misrepresentation and omission concern the best execution of the trades by routing the orders based on payment for order flow. Execution of the orders, impacted by the defendants' alleged fraud, results in the sale or purchase of securities by an entity other than the defendants.  Similarly, the defendants' conduct impacts the profit and opportunity associated with the sale or purchase of securities, as alleged by the plaintiff, whether the orders are executed or not.  By virtue of the plaintiff's orders, the plaintiff necessarily had an interest (or attempted interest) in the securities.  Thus the misrepresentations or omissions coincide with the purchase or sale of covered securities.  As all four elements have been met, the plaintiff's claims are preempted by SLUSA and should be dismissed.

**B.    Federal Regulation Preemption**

The defendants argue resolution of the plaintiff's claims necessarily extends beyond the parties' contractual relationship and state law to invade the federal regulatory framework governing order flow payments and order execution.  **See** Filing No. 55 - Brief p. 42.  The plaintiff denies his claims are preempted because no conflict exists between the federal regulations and the claims.  **See** Filing No. 59 - Response p. 28-29.  Although the plaintiff does not dispute order flow payments are permissible, he contends the defendants allowed the amount of the payments to override all other factors when making order routing decisions.  ***Id.*** at 33.  In reply, the defendants contend the plaintiff attempts to add a motive-based standard to federal regulation best execution requirements creating a conflict between federal and state law.  **See** Filing No. 63 - Reply p. 21-22.

"Ordinary preemption is a federal defense that exists where a federal law has superseded a state law claim.  Express preemption occurs where a federal law explicitly prohibits or displaces state regulation in a given field."  ***Johnson v. MFA Petroleum Co.***, 701 F.3d 243, 248 (8th Cir. 2012) (internal citation omitted).  "Preemption may also be applied in situations where a state [law] directly conflicts with federal law, or in limited circumstances where 'a federal law completely occupies the field of regulation so that by implication there is no room for state regulation and the coexistence of federal and state regulation is not possible.'"  ***Id.*** (**citing** ***Florida Lime & Avocado Growers, Inc. v. Paul***, 373 U.S. 132, 142-43 (1963) and **quoting** ***Mo. Bd. of Exam'rs for Hearing Instrument Specialists v. Hearing Help Express, Inc.***, 447 F.3d 1033, 1035 (8th Cir. 2006)); **see** ***Guice v. Charles Schwab & Co.***, 674 N.E.2d 282, 285 (N.Y. 1996) (noting preemption applies to State statutory or regulatory law and common law) (**citing** ***Freightliner Corp. v. Myrick***, 514 U.S. 280, 286-87 (1995)).  "Pre-emption may result not only from action taken by Congress itself; a federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation."  ***La. Pub. Serv. Comm'n v. FCC***, 476 U.S. 355, 369 (1986).

The defendants appear to confine their argument to conflict preemption.  State law will conflict with federal law when "'compliance with both federal and state regulations is a physical impossibility' or when state law 'stands as an obstacle to the

accomplishment and execution of the full purposes and objectives of Congress.'" *Qwest Corp. v. Minnesota Pub. Util. Comm'n*, 684 F.3d 721, 726 (8th Cir. 2012) (**quoting** *Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985)).  Otherwise, state law may coexist with the federal regulation to the extent they are not inconsistent.  *Merrill  Lynch, Pierce, Fenner & Smith, Inc. v. Ware*, 414 U.S. 117, 137 (1973).

Potential conflict exists between the plaintiff's claims and the U.S. Securities and Exchange Commission's (SEC) implementation of Securities Exchange Act regulations. Effective May 31, 2012, the SEC approved FINRA[2] Rule 5310, known as the Best Execution Rule, which requires member firms, such as the defendants, to "use *reasonable diligence* to ascertain the best market for the subject security and buy or sell in such market so that the resultant price to the customer is as favorable as possible under  prevailing  market  conditions."   FINRA Rule 5310(a)  (emphasis  added). Reasonable diligence is determined by examining such factors as:

> (A) the character of the market for the security (e.g., price, volatility,  relative  liquidity,  and  pressure  on  available communications);
> (B) the size and type of transaction;
> (C) the number of markets checked; [and]
> (D) accessibility of the quotation[.]

*Id.*  Moreover, the members are required to conduct a "regular and rigorous" review of the execution quality.  *Id.* Supp. Material .09.

> In reviewing and comparing the execution quality of its current order routing and execution arrangements to the execution quality of other markets, a member should consider the following factors:
> (1) price improvement opportunities (i.e., the difference between the execution price and the best quotes prevailing at the time the order is received by the market);
> (2) differences in price disimprovement (i.e., situations in which a customer receives a worse price at execution than the best quotes prevailing at the time the order is received by the market);
> (3) the likelihood of execution of limit orders;

---

[2] Financial Industry Regulatory Authority (FINRA) "enacts rules and publishes guidance in its role as regulator of securities firms and brokers."  **See** Filing No. 55 - Brief p. 15 n.3.

(4) the speed of execution;

(5) the size of execution;

(6) transaction costs;

(7) customer needs and expectations; and

(8) **the existence of internalization or payment for order flow arrangements**.

*Id.* (emphasis added).

The plaintiff pleads the defendants were contractually obligated and otherwise duty bound to "consider a wide variety of factors," such as those listed above, but instead excluded all factors except the payment for order flow arrangements. **See** Filing No. 47 - Response p. 33-34; **see** Filing No. 1 - Complaint ¶¶ 46, 48, 79. The plaintiff argues the claims arise from the defendants' failure to carry out their contractual and statutory obligations. *Id.* at 34. No conflict exists because the plaintiff's claims are consistent with the regulatory requirements.

Comparison in this case revolves around the manner in which the defendants are required to examine the factors leading to execution quality. Here, the contract obligates the defendants to "consider a wide variety of [enumerated] factors" while the regulations require the defendants to conduct a "rigorous" review of a variety of factors, including payment for order flow arrangements, as evidence of the defendants' reasonable diligence in determining the best market for the subject security. The improper conduct alleged by the plaintiff, failure to consider a wide variety of factors, runs afoul of both the client agreement and the relevant regulation. The contract obligations do not diverge from the federally imposed standards. Accordingly, compliance with the contract language and other alleged duties creates no physical impossibility or obstacle to compliance with federal regulation or its purposes.

The cases relied upon by the defendants similarly suggest this result. Those cases analyze the SEC's treatment of payment for order flow disclosures finding "State common-law agency principles inevitably will supplant the disclosure rules of the SEC" such that brokers merely complying with Federal regulations would be unable to avoid civil liability. *Guice*, 674 N.E.2d at 291 (finding implied conflict preemption); **see also** ***Shulick v. Painewebber, Inc.***, 722 A.2d 148 (Pa. 1998) (holding "federal regulation of the narrow subject of disclosure of order flow payments is so thorough that we have no difficulty in finding . . . that no room has been left for a state to impose additional

requirements"); **but see** ***Dahl v. Charles Schwab & Co.***, 545 N.W.2d 918, 925-26 (Minn. 1996) (finding state law payment for order flow consent requirements preempted because "given the complicated and intricate nature of the securities industry, anything affecting a practice as widely utilized as this one will have a significant impact on the securities markets nationwide").   Payment for order flow disclosures are not at issue in this case.   Here, mere compliance with the federally imposed standards would not create liability under the client agreement and similar alleged duties.   Likewise, mere compliance with the client agreement and alleged duties would not upset the balance of regulatory goals struck by the SEC rules.   Therefore, conflict preemption principles create no impediment to the plaintiff's claims and the defendants' motion on this basis should be denied.

## C.   Plausibility of Claims

The defendants move to dismiss the Complaint, arguing the plaintiff fails to allege sufficient factual matter to state a claim for relief that is plausible on its face in accordance with Federal Rule of Procedure 8.   **See** Filing No. 54 - Motion p. 1.   "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"   ***Bell Atl. Corp. v. Twombly***, 550 U.S. 544, 555 (2007) (alteration in original) (**quoting** Fed. R. Civ. P. 8(a)(2) and ***Conley v. Gibson***, 355 U.S. 41, 47 (1957)).   "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"   ***Ashcroft v. Iqbal***, 556 U.S. 662, 678 (2009).   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   ***Id.***

While the court must accept as true the factual allegations, such imperative does not apply to legal conclusions.   ***Zayed***, 779 F.3d at 732-33.   "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."   ***Iqbal***, 556 U.S. at 678.   A court engages in a context-specific exercise drawing "on its judicial experience and common sense" to determine whether a complaint states

a plausible claim for relief.  *Id.* at 679.  "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (**quoting** *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

### 1.    Breach of Contract

Under Nebraska law, "[i]n order to recover in an action for breach of contract, the plaintiff must plead and prove the existence of a promise, its breach, damage, and compliance with any conditions precedent that activate the defendant's duty." *Jackson Harmon Enters., LLC v. Ins. Auto Auctions, Inc.*, No. 8:13CV3194, 2015 WL 2061997, at *6 (D. Neb.  May 1, 2015) (**quoting** *Phipps v. Skyview Farms, Inc.*, 610 N.W.2d 723, 730 (Neb. 2000)); **see** *168th & Dodge, LP v. Rave Reviews Cinemas, LLC*, 501 F.3d 945, 950 (8th Cir. 2007).  The defendants argue the plaintiff has not adequately pled the existence of any promise, its breach, or resulting damage.  **See** Filing No. 55 - Brief p. 66-67.

#### a.    Promise

The defendants do not quarrel with the existence and language contained in the client agreement.  Nevertheless, the defendants argue the plaintiff's breach of contract claim alleges breach of an obligation already imposed by governing law, which cannot also support an independent contractual obligation.  *Id.* at 67-68.  The defendants assert the factors listed for the defendants' consideration in routing orders merely restates the federal requirements.  *Id.* at 67-68.  Specifically, the defendants contend the client agreement incorporates the Best Execution Rule set out in FINRA Rule 5310. **See** Filing No. 63 - Reply p. 27-28.  Moreover, the defendants argue the factors are listed in a portion of the agreement such that they do not constitute promises by the defendants, but rather are only a client's acknowledgement of factors the defendants "state[ ] [they] consider[ ]," rather than "promise" they will consider.  **See** Filing No. 55 - Brief p. 68.

Nebraska courts agree with the principle "a contract's implied incorporation of rules and regulations that govern a broker-dealer's dealings with an investor will not

support a private cause of action when the rules and regulations themselves provide no private cause of action." ***Knights of Columbus Council 3152 v. KFS BD, Inc.***, 791 N.W.2d 317, 326 (Neb. 2010) (**citing *Gurfein v. Ameritrade, Inc.***, 312 Fed. Appx. 410 (2d Cir. 2009)); **see *Gurfein v. Ameritrade, Inc.***, No. 04Civ9526, 2007 WL 2049771, at *3 (S.D.N.Y. July 17, 2007) (noting "when those regulatory rules are incorporated into a customer agreement, they do not bring with them a right to sue for an infraction").  In ***Knights of Columbus***, the plaintiff's complaint alleged "the defendants (1) agreed in the new customer agreements to comply with all federal and state laws and NASD bylaws and rules and (2) breached these contracts when they failed to comply with these laws." ***Knights of Columbus***, 791 N.W2d at 325-26.

The plaintiff contends the Complaint alleges the existence of a promise explicitly contained in the client agreement.  **See** Filing No. 59 - Response p. 36.  The plaintiff notes the client agreement provides an "exception" to the defendants' "required" best execution determination:  only when the client instructs the defendants to use a particular market for execution.  ***Id.*** at 36 (**quoting** Filing No. 1 - Ex A Client Agreement ¶ 8(a)).  Provision of the exception supports the plaintiff's argument the defendants are contractually obligated to provide best execution.  ***Id.***  The plaintiff states he relies not on the parallel regulations as a private right of action, but on the express contract language for his claim.  ***Id.***

The plaintiff's Complaint and underlying contract differ significantly from those in the cases cited by the defendants.  Here, the underlying contract goes beyond an implied or explicit incorporation of the federal regulations.  The contract explicitly identifies the factors the defendants agreed to consider without reference to any other source, despite similarity to particular relevant regulations.  Accordingly, the court concludes the Complaint alleges the existence of an underlying contract demonstrating the defendants' independent contractual obligation sufficient to avoid dismissal on this basis.

b.    Breach

The defendants argue the plaintiff failed to plead factual allegations supporting a breach of the client agreement.  **See** Filing No. 55 - Brief p. 68.  The defendants

contend the plaintiff merely alleges the defendants were not actually using the order routing process they said they were. *Id.* (**citing** Filing No. 1 - Complaint ¶ 55). More specifically, the defendants argue the plaintiff fails to describe deficiencies in the defendants' order routing process or suggest any factors the defendants neglected to consider. **See** Filing No. 55 - Brief p. 54-61, 69. Moreover, the defendants contend the plaintiff fails to supply anything beyond conclusory statements suggesting the payments for order flow are inconsistent with the defendants' best execution obligations. *Id.* at 56-57. The defendants contend the plaintiff's supportable factual allegations, taken as true, without unsupportable irrational inferences unsuccessfully signify actionable allegations, require dismissal of the claim. *Id.* at 54-61, 69. The defendants contend the plaintiff's characterizations of Quirk's testimony, Nagy's comments, academic research, and other allegations fall short of reasonable inferences plausibly entitling the plaintiff to relief. *Id.* at 58-61, 68-69.

The plaintiff responds by stating, "[b]ecause [the defendants] ignored all of those factors and instead routed Plaintiff's trades based solely upon one factor that was none of those enumerated in the contract – payment to TD Ameritrade by trading venues and market makers – [the defendants] breached their contractual obligation and 'promise' to Plaintiff." **See** Filing No. 59 - Response p. 36-37. Similarly stated, the plaintiff alleges the defendants materially breached the client agreement when "[r]ather than consider those factors in evaluating execution quality for routing client orders, TD Ameritrade routed virtually all of its clients orders based on the venue that paid the most to TD Ameritrade." **See** Filing No. 1 - Complaint ¶ 87.

The plaintiff alleges the defendants routed customer orders based solely on one factor, ignoring the various factors delineated in the client agreement. **See** Filing No. 59 - Response p. 36-37; Filing No. 1 - Complaint ¶¶ 84-88. In support of this allegation, the plaintiff's Complaint alleges "the TD Ameritrade executive testified [the defendants] routed 'virtually all' client trades ***not*** to ensure best execution, but for the purpose of maximizing kickbacks. . . ." **See** Filing No. 1 - Complaint ¶¶ 3, 68-69 (referencing Quirk's testimony). Additionally, the plaintiff characterizes Quirk's testimony as admitting the "[d]efendants virtually always routed TD Ameritrade's clients' orders based on which venue paid TD Ameritrade the most for its clients' trades . . . . [and] best

execution is an afterthought to [the d]efendants' real motivation to seek payments from the highest bidder." **Id.** ¶ 69. The plaintiff also states, "Quirk's testimony is an admission that the Company sells its order flow to the highest bidder regardless of best execution. **See** Filing No. 59 - Response p. 43.

On June 17, 2014, the Permanent Subcommittee on Investigations of the Committee on Homeland Security and Governmental Affairs of the U.S. Senate held a hearing on the topic of conflicts of interest, investor loss of confidence, and high speed trading in U.S. stock markets. **See** Filing No. 56-2 - Hearing Transcript (Tr.). Quirk spoke at the hearing, giving the following remarks, among others:

> Brokers are required to seek the most favorable terms reasonably available under the circumstances for client orders. At our firm we consider the opportunity to obtain a better price than currently quoted, the speed of execution, and the likelihood of execution, amongst other factors when making that assessment.
> We also give our clients a choice. Their orders can be routed using our proprietary order routing logic, or they can choose from a list of direct routing destinations.
> Finally, we work with multiple market destinations. Rather than internalize our client flow, we believe that routing all orders to the market is more transparent and better aligned with the needs of our clients. We select these market centers based on rigorous due diligence where execution quality is the top priority. After, and only after, a market satisfies our standards for best execution do we consider transaction costs or revenue opportunities.

Filing No. 56-2 p. 6 - Tr. 38.

After making his statement, Quirk answered questions, including:

> Senator LEVIN. Is the size of the rebate offered by an exchange a factor in determining where you route nonmarketable customer orders?
> Mr. QUIRK. The way that our committees and the people responsible for order routing approach this is they start with the best execution, and they would go through a list of variables that we should consider as hurdles. And in order to get to a point where the revenue sharing is even considered, those hurdles have to be cleared.
> Senator LEVIN. And the revenue sharing that you are talking about is the rebate?
> Mr. QUIRK. Correct, sir.

* * *

>Senator LEVIN [continuing].  After you say you have looked at the other factors, and then you look at the rebate issue, my question is:  Is the size of the rebate offered by an exchange a factor in determining where you route those nonmarketable customer orders?
>
>Mr. QUIRK.  Yes.  It would be the last factor.  All things being equal, that would be a factor.
>
>Senator LEVIN.  And so the greater the rebate, that would be where you would go if it is otherwise best market.
>
>Mr. QUIRK.  Yes.

*Id.* at 10 - Tr. 46.

>Senator LEVIN.  And so, again, your subjective judgment as to which market provided best execution for tens of millions of customer orders virtually always led you to route orders to the markets that paid you the most.
>
>* * *
>
>Mr. QUIRK.  Virtually, yes.

*Id.* at 12 - Tr. 48.

The court finds Quirk's testimony, as referenced by the plaintiff, insufficient to support a reasonable inference the defendants' payment-for-order-flow payments overrode every other factor in their routing decisions.  Testimony, if true, that virtually all customer orders were routed through the highest paying markets, is potentially consistent with the plaintiffs' theory; yet, standing alone, it fails to support the inference the defendants neglected to consider any of the other factors listed in the client agreement.  Moreover, even a cursory review of Quirk's contemporaneous hearing testimony directly and explicitly contradicts the plaintiff's interpretation.  Quirk testified, "[a]fter, and only after, a market satisfies our standards for best execution do we consider transaction costs or revenue opportunities" and "[a]ll things being equal, [rebate size] would be a factor," but it "would be the last factor."  **See** Filing No. 56-2 p. 6, 10 - Tr. 38, 46.

The plaintiff's Complaint also relies on an author's rendition of comments made by the defendants' former employee, Nagy.  **See** Filing No. 1 - Complaint ¶ 59.  Specifically, the plaintiff alleges

>Nagy described the negotiations he was involved in, which were done face-to-face to prevent a paper trail:  "'Most of the deals tend to be handshake deals. . . .  You go out to a steak

> dinner. "We'll pay you two cents a share. Everything is good."'" He added: "'The payment for the order flow is as off-the-record as possible . . . . They never have an email or even a phone call. You had to fly down to meet us.'"

*Id.* (footnotes omitted). The allegation, if true, does not support the plaintiff's claim the defendants' breached the customer agreement. Seemingly inconsistently, the plaintiff's Complaint also relies on allegations the defendants admit, by inference, in SEC filings they "always routed orders to the market venue that paid the most." **See** Filing No. 1 - Complaint ¶¶ 61-65. The defendants' admission may be relevant; however, as with the allegation above, it does not lend facial plausibility to the plaintiff's claim the defendants failed to consider the factors listed in the customer agreement before they routed orders.

The plaintiff concedes nothing prohibits the defendants from receiving payment for order flow and receipt of such payments is not necessarily inconsistent with best execution obligations. **See** Filing No. 59 - Response p. 33; **see also** Filing No. 1 - Complaint ¶ 48. Nevertheless, the plaintiff implies his allegations about the defendants routing "virtually all" orders to venues paying for order flow ***means*** the defendants fail to consider any factor other than payment for order flow. **See, e.g.,** Filing No. 59 - Response p. 32-33, 41-46. The plaintiff's allegations in the Complaint as a whole fail to support the inference the defendants neglected to consider any of the other factors listed in the client agreement. The plaintiff's focus on a single factor, even with objective and unopposed evidence confirming the defendants' reliance on the factor, provides no reasonable inference about whether the defendants relied upon or neglected any other factor. Accordingly, the plaintiff's claim the defendants breached the client agreement by failing to consider a wide variety of factors in order routing decisions is unsupported by well-pled factual allegations sufficient to avoid dismissal.

### c.    Damages

The defendants argue the plaintiff failed to plead factual allegations supporting damages for breach of contract. **See** Filing No. 55 - Brief p. 69. The defendants contend the plaintiff does not identify any non-speculative losses. **See** Filing No. 63 - Reply p. 30. The plaintiff asserts he has pleaded damages flowing from the defendants'

breach with several available measures of contract damages, including restitution.  **See** Filing No. 59 - Response p. 37.  The plaintiff alleges he suffered damage, including economic injury, as a result of the defendants' failure to execute trades in a manner complying with the contract and duty of best execution.  **See** Filing No. 1 - Complaint p. 31-35.  Additionally, the plaintiff alleges his trades were sent to venues where they were exploited by others, causing him to miss profit opportunities.  ***Id.*** at 33-34.  In these ways, the plaintiff contends the defendants were wrongly enriched.  ***Id.*** at 31.  Although the plaintiff suggests his economic injury could be determined at trial, he seeks "restitution of commissions on all trades, and/or disgorgement of profits from payments for order flow and liquidity or maker rebates earned from [the defendants'] material and opportunistic breaches of contract and misrepresentations" and "attaching, impounding and imposing a constructive trust on or otherwise restricting the proceeds of Defendants' trading activities or their other assets."  ***Id.*** at 36-37.

"In a breach of contract case, the ultimate objective of a damages award is to put the injured party in the same position the injured party would have occupied if the contract had been performed, that is, to make the injured party whole."  ***Gary's Implement, Inc. v. Bridgeport Tractor Parts, Inc.***, 799 N.W.2d 249, 257 (Neb. 2011). "The principle underlying allowance of damages is to place the injured party in the same position, so far as money can do it, as he or she would have been had there been no injury or breach of duty, that is, to compensate for the injury ***actually sustained***."  ***J.D. Warehouse v. Lutz & Co.***, 639 N.W.2d 88, 92 (Neb. 2002) (emphasis added).  In Nebraska, the plaintiff has the initial burden of offering evidence sufficient to prove damages.  **See *Bedore v. Ranch Oil Co.***, 805 N.W.2d 68, 86 (Neb. 2011).  "Generally, while damages need not be proved with mathematical certainty, neither can they be established by evidence which is speculative and conjectural."  ***Sack Bros. v. Great Plains Co-op., Inc.***, 616 N.W.2d 796, 809 (Neb. 2000).  "Damages which are uncertain, speculative, or conjectural cannot be a basis for recovery."  ***Hitzemann v. Adam***, 518 N.W.2d 102, 107 (Neb. 1994); **see *American Cent. City, Inc. v. Joint Antelope Valley Auth.***, 807 N.W.2d 170, 181 (Neb. 2011).  "Uncertainty as to the fact of whether damages were sustained at all is fatal to recovery."  ***Sack Bros.***, 616 N.W.2d at 809; **see *Gary's Implement***, 799 N.W.2d at 259.  Proof of damages "is sufficient if the

evidence is such as to allow the trier of fact to estimate actual damages with a reasonable degree of certainty and exactness." *Pribil v. Koinzan*, 266 Neb. 222, 227 (Neb. 2003); see *Lesiak v. Central Valley Ag Co-op., Inc.*, 808 N.W.2d 67, 76-77 (Neb. 2012) ("requir[ing] enough evidence to provide a reasonable basis for the jury to estimate the extent of the damage"); *Gary's Implement*, 799 N.W.2d at 259 (An injured party will not be precluded from recovering because an exact computation is difficult.).

"One injured by a breach of contract is entitled to recover all its damages, including the gains prevented as well as the losses sustained, provided the damages are reasonably certain and such as might be expected to follow the breach." *Gary's Implement*, 799 N.W.2d at 257. "Thus, the nonbreaching party's general or direct damages are measured by the loss in value of the performance promised by the breacher--that is, the value of what was promised by the breaching party minus the value of the performance actually rendered. . . ." 24 Williston on Contracts § 64:1 p. 11 (4th ed. 2002). Although lost profits are generally too speculative and conjectural to permit, as with any other damages, such damages may be "recovered if the evidence shows with reasonable certainty both the loss and the extent thereof." *Gary's Implement*, 799 N.W.2d at 259.

> In prior Nebraska cases involving recovery of damages for lost profits, the focus has been on whether it was proven that it is reasonably certain such profits would have been realized, and that the lost profits can be ascertained and measured from the evidence introduced with reasonable certainty. Such lost profits must not be speculative, remote, or imaginary, but must be established with reasonable certainty by the evidence.

*El Fredo Pizza, Inc. v. Roto-Flex Oven Co.*, 261 N.W.2d 358, 364 (Neb. 1978).

Generally, a party "cannot recover damages merely for an 'increased risk' of harm." *Tillman v. C.R. Bard, Inc.*, No. 3:13CV222, 2015 WL 1456657, at *35 (M.D. Fla. Mar. 30, 2015) (noting jury could conclude medical device malfunction exposes patient to a real calculable risk of life-threatening harm). The plaintiff here does not argue the defendants' past conduct causes risk of future harm, which itself is subject to a higher level of court scrutiny. See *Holmes v. Countrywide Fin. Corp.*, No. 5:08CV205, 2012 WL 2873892, at *5-6 (W.D. Ky. July 12, 2012) (holding plaintiffs failed to allege a compensable injury for breach of contract absent direct financial harm when

security breach caused risk of identity theft); ***Giordano v. Wachovia Sec., LLC***, No. 06-476 JBS, 2006 WL 2177036, at *3 (D.N.J. July 31, 2006) (noting "because the plaintiff's injuries were solely the result of a perceived risk of future injury [identity theft], plaintiff had failed to show a present injury or reasonably certain future injury to support damages for any alleged increased risk of harm"); **Harms v. Laboratory Corp. of Am.**, 155 F. Supp. 2d 891, 912 (N.D. Ill. 2001) (granting summary judgment as to the plaintiffs' claim for "damages for risk of future harm" because "it is impossible to determine without speculation what sort of injury—if any—[would occur]").  Rather, the plaintiff argues he was subject to past risk of harm without any suggestion of a cognizable injury actually sustained.  **See** Filing No. 1 - Complaint p. 33-34.  In any event, "the increased risk [of injury] must be based on evidence and not speculation, and, more importantly, the size of the award must reflect the probability of occurrence." ***Dillon v. Evanston Hosp.***,771 N.E.2d 357, 371 (Ill. 2002) (noting future risk of injury as an element of damages).

In this case, the plaintiff suggests a zero probability of occurrence, since no actual injury is alleged despite the time period encompassing the risk of harm having preceded this lawsuit.  **See *Iqbal***, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  The record is devoid of conflicting evidence or even allegations supporting the plaintiff's ability to prove the existence and likelihood of damages in the form of exposure "to toxic high-frequency trading, putting at risk that the trades would execute at the best price, or would possibly not trade at all, resulting in lost profit and lost opportunities."  **See** Filing No. 1 - Complaint ¶ 83.  Similarly, the plaintiff alleges he was damaged because he did not receive the best execution on his trades, but rather than suggest an economic harm actually occurred he merely alleges the execution profited the defendants.  **See *id.*** ¶¶ 87-88.

The plaintiff's Complaint seeks "disgorgement of [the defendants'] profits from payment for order flow . . . earned from their material and opportunistic breaches of contract."  ***Id.*** at 36-37.  While the plaintiff appears to acknowledge disgorgement is unavailable as relief in a breach of contract case subject to Nebraska law (s**ee** Filing No. 59 - Response p. 37), the court finds disgorgement inappropriate under the alleged

20

facts.  "In a diversity case, decisions of the state's highest court are to be accepted as defining state law unless the state court 'has later given clear and persuasive indication that its pronouncement will be modified, limited, or restricted.'"  *M & I Marshall & Ilsley Bank v. Sunrise Farms  Dev., LLC*, 737 F.3d 1198, 1199-2000 (8th Cir. 2013) (citations omitted); **see** *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78-80 (1938).  "The highest court of each State, of course, remains 'the final arbiter of what is state law.'"  *Montana v. Wyoming*, 131 S. Ct. 1765, 1773 n.5 (2011).  Without governing precedent, the court must predict how the highest court would decide the issue.  *Jordan v. Safeco Ins. Co. of Illinois*, 741 F.3d 882, 887-88 (8th Cir. 2014).  To aid in the prediction, the court "look[s] to related decisions by the state's highest court and by the intermediate court of appeals."  *Palmer v. Illinois Farmers Ins. Co.*, 666 F.3d 1081, 1085 (8th Cir. 2012).

"Nebraska has not recognized disgorgement of the breaching party's profits as damages available to an injured party."  *Rambo v. Sullivan R.E. Group, L.L.C.*, No. A-05-1020, 2007 WL 2122172, at *8 (Neb. Ct. App.  July 24, 2007) (denying disgorgement for breach of contract claim and fraudulent misrepresentation) (**citing** 3 Dan B. Dobbs, Dobbs Law of Remedies § 12.7(4) (2d ed.1993)).  "[T]he practice in contract cases is . . . one who merely breaches a contract is not required to restore collateral profits or gains facilitated by the breach. . . .  The 'rule' merely permits the breacher to retain gains or profits that result from his own breach but that are not the result of the plaintiff's own performance."  *Rambo*, 2007 WL 2122172, at *8 (**quoting** Dobbs Law of Remedies at 170-71).  The Nebraska courts have recognized disgorgement as a remedy for unjust enrichment, which claim exists "only in the absence of an agreement between the parties."  *Washa v. Miller*, 546 N.W.2d 813, 818-19 (1996); **see** *Paltani v. Limited Fill Corp.*, No. A–10–951, 2011 WL 2724269, at *5 (Neb. Ct. App. July 12, 2011).  The Nebraska Supreme Court specifically held, "[t]he doctrine does not operate to rescue a party from the consequences of a bad bargain.  In other words, the enrichment of one party at the expense of the other is not unjust where it is permissible under the terms of an express contract."  *Washa*, 546 N.W.2d at 819; **see** *Corona v. First Nat. Bank of Omaha*, No. 8:12CV89, 2014 WL 2558327, at *4 (D. Neb. June 6, 2014).

At this stage in the proceedings, although the plaintiff is not required to come forward with evidence to support his allegations, the plaintiff must set forth a plausible claim for relief.  The plaintiff has not done that here.  The relevant case law does not support the plaintiff's claims individually or for class treatment.  Moreover, in evaluating whether a plaintiff has suffered an ascertainable loss, the court may not rely on "hypothetical or illusory" losses or wholly subjective expectations of a potential risk with unrealized harm.  This is particularly true, where, as here, the express terms of the contract permit the defendants to consider and receive order flow payments.  **See** Filing No. 46 - Ex. 1(B) Client Agreement § 8(d) (The defendants "may receive remuneration from markets for directing orders to them.  The source and amount of these payments are available upon written request."); **see also *Washa***, 546 N.W.2d at 819 (holding "the enrichment of one party at expense of the other is not unjust where it is permissible under the terms of an express contract").

### 2.       Intentional or Negligent Misrepresentation

The defendants contend the plaintiff's claims for fraud by intentional misrepresentation (Count II), negligent misrepresentation (Count III), and aiding and abetting (Count V) fail to state claims for relief.  **See** Filing No. 55 - Brief p. 52-66, 72-73.  The plaintiff does not disagree these three claims are related based on the similarities of their elements.  **See** Filing No. 59 - Response p. 53, 57.  The plaintiff's aiding and abetting claim relies on his tortious conduct allegations, which the plaintiff asserts arise from the intentional or negligent misrepresentation.  ***Id.*** at 57.

> To state a claim for fraudulent misrepresentation, a plaintiff must allege (1) that a representation was made; (2) that the representation was false; (3) that when made, the representation was known to be false or made recklessly without knowledge of its truth and as a positive assertion; (4) that the representation was made with the intention that the plaintiff should rely on it; (5) that the plaintiff did so rely on it; and (6) that the plaintiff suffered damage as a result.

***Knights of Columbus Council***, 791 N.W.2d at 331.

A claim for negligent misrepresentation also requires a plaintiff to allege a defendant supplied false information.  ***Id.*** at 330 (listing all elements for negligent misrepresentation).  Similarly, a claim for fraudulent concealment requires a plaintiff to

allege a defendant knowingly concealed a material fact.  *Id.* at 334 (listing all elements for fraudulent concealment).  The Nebraska Supreme Court held, "an overlap exists between fraudulent concealment claims and misrepresentation claims based on half-truths or ambiguities.  That is, if a defendant's partial or ambiguous representation is materially misleading, then the defendant has a duty to disclose known facts that are necessary to prevent the representation from being misleading."  *Id.* at 332-33.

The plaintiff's Complaint alleges the defendants are liable under the above theories based on the defendants' representations they route trade orders after consideration of a variety of factors in compliance with their duty of best execution, but instead routed orders based on a single factor to obtain the highest order flow payments.  **See** Filing No. 1 - Complaint p. 32-34.  As further expanded above, the plaintiff's allegations, taken as true, support an inference the defendants considered order flow payments when routing order.  However, the plaintiff's allegations provide no reasonable or plausible inferences about whether the defendants relied upon or neglected any other factor.  Accordingly, the plaintiff's claim the defendants made a false representation or omission by failing to consider a wide variety of factors in order routing decisions is unsupported by well-pled factual allegations sufficient to avoid dismissal.  For this reason, the court need not address the remaining elements of each of these claims.  Nevertheless, the court finds the plaintiff fails to plausibly support a claim for damages.

The intentional and negligent misrepresentation claims rely upon the plaintiff pleading he suffered damage as a result of the defendants' conduct.  **See *Knights of Columbus Council***, 791 N.W.2d at 331 (listing elements for fraudulent misrepresentation); ***Lucky 7, L.L.C. v. THT Realty, L.L.C.***, 775 N.W.2d 671 (Neb. 2009) (noting "Negligent misrepresentation has essentially the same elements as fraudulent misrepresentation, with the exception of the defendant's mental state."); **see also *Zawaideh v. Nebraska HHS Regulation & Licensure***, 792 N.W.2d 484, 495 (Neb. 2011) (listing elements for fraudulent concealment claim).

The plaintiff's Complaint alleges he suffered damage by not having received best execution for his trades, resulting in "missed opportunities to profit when their trades failed to be executed, were not fully filled, and failed to obtain the best price

improvement.  In addition . . . [he was] exploited by [high-frequency traders] . . . to [his] detriment."  **See** Filing No. 59 - Response p. 49-50 (**citing** Filing No. 1 - Complaint ¶¶ 95, 101).  The plaintiff fails to allege actual economic harm.  Instead, the plaintiff alleges he and the class members were "exposed" to harm and "at risk" for missed opportunities, neither of which are quantified or qualified with more than conclusory statements.  **See** *Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  The record is devoid of conflicting evidence or even allegations supporting the plaintiff's ability to prove the existence and likelihood of damages in the form of exposure "to toxic high-frequency trading, putting at risk that the trades would execute at the best price, or would possibly not trade at all, resulting in lost profit and lost opportunities."  **See** Filing No. 1 - Complaint ¶ 83.  Similarly, the plaintiff alleges he was damaged because he did not receive the best execution on his trades, but rather than suggest an actual economic harm occurred to him or others, he merely notes the defendants' profit.  **See** *id.* ¶¶ 87-88.

### 3.    Nebraska's Consumer Protection Act

The defendants contend the plaintiff's NCPA claim is expressly exempted under the plain terms of the NCPA.  **See** Filing No. 55 - Brief p. 70-71.  The defendants argue the NCPA does not apply to actions or transactions regulated by federal regulators.  *Id.* at 71.

> Except as provided in subsection (2) of this Section [which does not apply to the instant case], *the Consumer Protection Act shall not apply to actions or transactions otherwise permitted, prohibited, or regulated under laws administered by* the Director of Insurance, the Public Service Commission, the Federal Energy Regulatory Commission, *or any other regulatory body or officer acting under statutory authority of this state or the United States*.

Neb. Rev. Stat. § 59-1617(1) (emphasis added); **see** *Wrede v. Exchange Bank of Gibbon*, 531 N.W.2d 523, 529-30 (Neb. 1995) (dismissing claim because allegations surrounded certificate of deposit regulated by Department of Banking and Finance which was exempted by NCPA); *Hydroflo Corp. v. First Nat'l Bank of Omaha*, 349

N.W.2d 615, 622 (Neb. 1984) (dismissing claims relating to practice of opening bank accounts, which were exempted by NCPA as regulated under broad authority of the Department of Banking and Finance).

The plaintiff argues the defendants' abrogation of common law, rather than federal or state statute, constitutes the applicable "action" under the NCPA. **See** Filing No. 59 - Response p. 55-56. The plaintiff contends this action represents performance of a contract, which is not regulated by the SEC or FINRA. *Id.* at 56. Finally, the plaintiff asserts the defendants' alleged conduct, including making false promises, ensued independently of the SEC's comparable duty of best execution. *Id.*

As discussed in more detail above, federal regulations adopted by the SEC govern the defendants' execution of trades. The SEC has broad authority over the defendants and their duty of best execution. Whether the defendants complied with their duty of best execution forms the basis of this action. The defendants' conduct and practices in this regard are, therefore, excluded from the terms of the NCPA and the plaintiff's claim should be dismissed. For these reasons,

### IT IS RECOMMENDED TO SENIOR JUDGE JOSEPH F. BATAILLON that:

The defendants' Motion to Dismiss Putative Class Action Complaint and Request to Take Judicial Notice (Filing No. 54) be granted as set forth above.

### ADMONITION

Pursuant to NECivR 72.2 any objection to this Report and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Report and Recommendation. Failure to timely object may constitute a waiver of any objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

**THE PARTIES ARE FURTHER ADMONISHED:  For this matter the court is imposing page limitations and other specifications.** The plaintiffs, as a group, and the defendants, as a group, may not exceed 25 pages for briefs in support of (inclusive

of any reply brief) or opposition to any objection pursuant to NECivR 72.2.  The page limit includes optional use of a table of contents and authorities.  All margins shall be one-inch on sides, top, and bottom.  The page limit excludes the case caption and notice of service, which should exceed no more than one-half page at the beginning and end of the brief, respectively.  Each page of a brief shall contain double-spaced text and single spaced footnotes.  Typeface text shall be in 12-point Arial font.   Footnote text may use 10-point font.

Dated this 17th day of September, 2015.

BY THE COURT:

s/ Thomas D. Thalken
United States Magistrate Judge